Miles Ehrlich (SBN 237954)
miles@ehrlich-craig.com
Amy Craig (SBN 272896)
amy@ehrlich-craig.com
EHRLICH & CRAIG LLP
803 Hearst Avenue
Berkeley, California 94710
Telephone: (510) 548-3600

*Attorneys for Defendant Mingran Wang*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>MINGRAN WANG,<br><br>Defendant. | Case No.: 4:26-CR-00288-HSG<br><br>**DEFENDANT MINGRAN WANG'S CORRECTED SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>Date: October 14, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: Courtroom 2 – 4th Floor<br><br>**REDACTED - PUBLICLY FILED** |

**TABLE OF CONTENTS**


Page(s)

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 3

A. Mr. Wang's History and Characteristics ..... 3

B. The Offense Conduct ..... 6

C. The Guidelines and the Parties' Positions ..... 10

III. SENTENCING ARGUMENT ..... 10

A. The Legal Standard ..... 10

B. A Custodial Sentence Would Create, Not Avoid, an Unwarranted Disparity ..... 11

C. Voluntary Cessation and Immediate Candor Eliminate Any Need for Specific Deterrence ..... 21

D. Incarceration Would Devastate a Family [redacted] ..... 24

E. Mr. Wang Has Already Been Punished Substantially, and the Remaining Purposes of Sentencing Do Not Require Prison ..... 24

IV. OBJECTIONS TO THE PSR ..... 26

V. CONCLUSION ..... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States,* 552 U.S. 38 (2007) .......... passim

*In re Behruz Afshar, et al.,* 3-16978 .......... 28

*In re Briargate Trading, LLC and Eric Oscher*, 3-16889 .......... 28

*In re Visionary Trading LLC, et al.,* 3-15823 .......... 28

*In re Xuepeng Xie*, 3-20599 .......... 26, 29

*In re Zachary Stevenson*, 3-22356 .......... 30

*Kimbrough v. United States*, 552 U.S. 85 (2007) .......... 12

*Pepper v. United States*, 562 U.S. 476 (2011) .......... 32

*SEC v. Artur Khachatryan*, 25-cv-11863 (C.D. Cal. 2025) .......... 8, 26, 30

*SEC v. Frank M. Cerisano, Jr.*, 26-cv-02444 (D. Nev. 2026) .......... passim

*SEC v. Harsh V. Patel*, 26-cv-03203 (S.D.N.Y. 2026) .......... 26, 27

*SEC v. James David O'Brien*, 674 F. Supp. 3d 85 (S.D.N.Y. 2023) .......... 26, 27, 29

*SEC v. Joel David Castro Leon and Shmuel A. Sherr*, 24-cv-09214 (D.N.J. 2024) .......... 26, 29

*SEC v. Lek Securities Corporation, et al.*, 17-cv-1789 (S.D.N.Y. 2017) .......... 27

*SEC v. Lek Securities Corporation, et.*, 17-cv-1789 (S.D.N.Y. 2017) .......... 28

*SEC v. Ryan N. Cole*, 25-cv-01038 (E.D. Cal. 2025) .......... 26, 30

*SEC v. Shuang Chen, et al.*, 19-cv-12127 (D. Mass. 2019) .......... 27, 29

*SEC v. Wang*, 26-cv-06291-HSG (N.D. Cal. 2026) .......... 10

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .......... 12

*United States v. Aleksandr Milrud*, 15-cr-455 (D.N.J. 2020) .......... 16, 25

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) .......... 11

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) .......... 10

*United States v. Cedric Chanu*, 18-cr-35 (N.D. Ill. 2021) .......... 16

*United States v. Christiaan Trunz*, 19-cr-375 (E.D.N.Y. 2023) .......... 14, 23

*United States v. Christopher Jordan*, 19-cr-669 (N.D. Ill. 2023) .......... 13, 21

*United States v. Corey Flaum*, 19-cr-338 (E.D.N.Y. 2023) .......... 20

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) .......... 12

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) .......... 24

*United States v. David Liew*, 17-cr-1 (N.D. III. 2021) .......... 14, 17

*United States v. Edward Bases*, 18-cr-48 (N.D. Ill. 2023) .......... 20, 25

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) .......... 11

*United States v. Gregg Smith*, 19-cr-669 (N.D. Ill. 2023) .......... 21

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) .......... 12

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) .......... 12

*United States v. James Vorley*, 18-cr-35 (N.D. Ill. 2021) .......... 18, 25

*United States v. Jiali Wang*, No. 22-cr-10123 (D. Mass. 2022) .......... passim

*United States v. Jiongsheng "Jim" Zhao*, 18-cr-24 (N.D. Ill. 2020) .......... 13, 15

*United States v. John Edmonds*, 18-cr-239 (D. Conn. 2023) .......... 14, 22

*United States v. John Pacilio*, 18-cr-48 (N.D. Ill. 2023) .......... 23

*United States v. Joseph Taub*, 18-cr-79 (D.N.J. 2021) .......... 18

*United States v. Kamaldeep Gandhi*, 18-cr-609 (S.D. Tex. 2021) .......... 17

*United States v. Krishna Mohan*, 18-cr-610 (S.D. Tex. 2021) .......... 17

*United States v. Menyweather*, 431 F.3d 692 (9th Cir. 2005) .......... 35

*United States v. Michael Coscia*, 14-cr-551 (N.D. Ill. 2016) .......... 14, 24

*United States v. Michael Kane*, 23-cr-20172 (S.D. Fla. 2024) .......... 24

*United States v. Michael Nowak*, 19-cr-669 (N.D. Ill. 2023) .......... 22

*United States v. Navinder Singh Sarao*, 15-cr-75 (N.D. Ill. 2020) .......... 8, 13, 15

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) .......... 36

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) .......... 35

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .......... 35

*United States v. Tyler Forbes*, 22-cr-97 (E.D.N.Y. 2022) .......... 14, 19

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (per curiam) .......... 11

*United States v. Xiaosong Wang*, 24-cr-10239 (D. Mass. 2024) .......... 24

**Statutes**

18 U.S.C § 3553(a)(6) .......... 11

18 U.S.C. § 3553(a) .......... 1, 3, 10, 22

18 U.S.C. § 3563(a)(2) .......... 25

18 U.S.C. § 3565(a)(2) .......... 25

**Other Authorities**

Nat'l Inst. of Justice, *Five Things About Deterrence* (May 2016), NCJ 247350 .......... 33

**United States Sentencing Guidelines**

U.S.S.G. App. B (2025) .......... 22

U.S.S.G App. C, Amend. 821 (2023) .......... 25

U.S.S.G. App. C, Amend. 836 (2025) .......... 22

U.S.S.G. §2B1.1 .......... 21

U.S.S.G. §2B1.1 cmt. n.21(C) (2024) .......... 11

U.S.S.G. §4C1.1 .......... 22

U.S.S.G. §5C1.1 cmt. n.10 (B) .......... 22

U.S.S.G. §5C1.1 cmt. n.9 (2025) .......... 22

U.S.S.G. §5H1.6 .......... 24

## I. INTRODUCTION

Mingran Wang will appear before this Court on October 14, 2026, to be sentenced for securities fraud, to which he pleaded guilty under a pre-indictment plea agreement on June 24, 2026. PSR ¶¶ 2–3. For about three years, trading alone, in his and his wife's accounts, Mr. Wang placed orders in thinly traded securities that he intended to cancel, nudging prices so that his genuine buy or sell orders on the other side of the market would fill at slightly better prices. PSR ¶¶ 6–9. This is known as spoofing. Mr. Wang has never denied that he engaged in this trading behavior, and he has never disputed that what he did was wrong.

Mr. Wang has already been substantially punished. He has forfeited every dollar he made in this trading—$1,347,000—which he paid in full before sentencing. PSR ¶ 13. He has consented to disgorgement; a civil penalty; a five-year prohibition on opening, maintaining, or trading in any brokerage account unless he first gives the broker-dealer a copy of the SEC's complaint and the SEC judgment; and an indefinite bar on acting as an investment adviser. PSR ¶ 17; Craig Decl. ¶ 12. He has closed the small investment fund he ran for his friends, PSR ¶ 55, and he will be a convicted felon for the rest of his life. The question under 18 U.S.C. § 3553(a) is whether the remaining purposes of sentencing also *require* imprisonment, rather than a substantial period of home confinement. For four reasons grounded in the record and the governing law, they do not.

*First*, a prison sentence of any length would create, rather than avoid, an unwarranted disparity. 18 U.S.C. § 3553(a)(6). Individual, non-institutional traders charged with spoofing thinly traded securities on their own behalf through ordinary brokerage accounts typically do not face criminal prosecution; they are sanctioned civilly by the SEC with disgorgement, penalties, and trading bars. As recently as August 2026, the SEC settled a case against a trader who was warned three times that his trading amounted to illegal spoofing, had his account closed for it, and then spoofed at least 3,000 more times over four years through accounts at other broker-dealers, netting about $1.1 million in gains; yet he faced no criminal charges. *See SEC v. Frank M. Cerisano, Jr.*, No. 26-cv-02444, ECF No. 1 (D. Nev. Aug. 10, 2026). Mr. Wang faces every sanction those traders received—and, on top of them, a felony conviction

and the forfeiture of every dollar he made. Among the 22 individuals who *have* been criminally sentenced for spoofing over the past decade—most of them futures or Treasury traders at banks and trading firms—every defendant sentenced to a term of imprisonment for whom offense-level information is available had an offense level higher than Mr. Wang's, and in all but one case, an offense level of 22 or higher (compared to Mr. Wang's offense level of 15).

*Second*, Mr. Wang stopped this improper trading on his own, before any broker, regulator, or law enforcement agent had contacted him about it. This is the kind of self-directed change that, under *Gall v. United States*, "lends strong support to the conclusion that imprisonment [is] not necessary" to deter future crimes or to protect the public. 552 U.S. 38, 59 (2007). In November 2024, prompted by a routine anti-money-laundering notice from his broker that had nothing to do with his trading, Mr. Wang went looking for information about his particular trading strategy. He then learned for the first time that it had a name and that it was a crime, and he quit immediately—even though his trading behavior was undetected and the strategy was still profitable. He also sold off nearly all the thinly traded securities he had been trading for this purpose. Federal agents did not contact him until eight months later. PSR ¶ 12.

*Third*, when agents did arrive in July 2025, Mr. Wang readily admitted his trading misconduct without seeking to interpose counsel. PSR ¶ 16. He has not wavered since engaging counsel: he entered a pre-indictment plea, consented to the SEC's judgment before its complaint was filed, and paid full forfeiture before sentencing on the day the Court authorized it. PSR ¶¶ 13, 16–17. In his letter to the Court, Tevin, Mr. Wang's adult son, explains that his father's immediate acceptance of responsibility is in keeping with the values Mr. Wang taught him: "when you are wrong, you own it fully and promptly rather than hide behind what's convenient." Craig Decl., Ex. B-2 ("T. Wang Letter") at 4. The government itself acknowledges that Mr. Wang "admitted to his misconduct during [his] initial law enforcement interview." Craig Decl. ¶ 7.

[redacted]

[redacted]

The Probation Office has already recognized that Mr. Wang's lack of criminal history and family obligations may warrant a sentence below the advisory range. PSR ¶ 81; PSR Sentencing Recommendation at 1. We agree, and respectfully submit that the same mitigating factors, together with the enforcement landscape for this offense and Mr. Wang's voluntary cessation and immediate candor, warrant a sentence without imprisonment: a term of probation with home detention, 500 hours of community service, continued mental health treatment, and trading restrictions. Such a sentence is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

## II. FACTUAL BACKGROUND

### A. Mr. Wang's History and Characteristics

#### 1. Background

Mr. Wang is 52. PSR ¶ 37. He was born in Taiyuan, China, earned a degree in physics there, and came to the United States in 1997 on a full scholarship to the University of Iowa, where he completed a master's degree in computer science in 2000. PSR ¶¶ 37, 41, 53. He worked as a software engineer and data scientist from 2000 to 2014, became a self-employed investor in 2014, and from 2022 to 2025 managed Greenroots, a $2.8 million fund pooled from close friends, as an exempt advisor—a role requiring no securities license, qualifying exam, or formal securities training. PSR ¶¶ 54–55. He became a naturalized citizen in 2011 and has lived in Fremont since 2009. PSR ¶ 41. He has no criminal history of any kind—no arrests, no charges, no convictions—and no history of substance abuse. PSR ¶¶ 30–35, 52. Each of the letters submitted to the Court describes Mr. Wang as a man of honor and integrity. Friends

describe him as someone who "calls out calculation mistakes that would have benefited him" during friendly games of poker (*Bryan Luo*), insists on paying rather than contesting dubious parking tickets (*June Wang*), and opens his home to neighbors after a roof leak made theirs uninhabitable (*Tianhan Wang*). Exs. B-5, B-3, B-6. Mr. Wang's generosity extends beyond friends and family. For six years, he has volunteered as a mentor for Valley Christian High School's entrepreneurship class, contributing his time and experience to students' education. Craig Decl., Ex. I at 1.

One of the strongest testaments to Mr. Wang's character lies not in what his friends say about him but in what they did: four of the individuals who have written to the Court on his behalf—a principal engineer at Amazon, the chief technology officer of a Santa Clara software company, a quantitative researcher at Wells Fargo, and a family friend of more than twenty years—entrusted him with their own savings, and in one case a parent's, to invest in Greenroots. *See* Craig Decl., Exs. B-5 ("B. Luo Letter") at 12 (becoming a partner in the fund because his trust in Mr. Wang "is so high," and describing it as "the most transparent and trusted financial relationship I have ever experienced"); B-3 ("J. Wang Letter") at 6 (she and her father "entrusted him with managing our investments because we had complete confidence in his judgment and his character"); B-7 ("S. Xia Letter") at 13 ("one of the first to invest," and noting that Mr. Wang "made sure the proper external audit and controls were in place to protect his investors"); & B-4 ("S. Liu Letter") at 10 (investing approximately $100,000 in January 2022 "based not only on a business opportunity, but on nearly three decades of personal knowledge of Mingran as a person"). Those are not abstract endorsements of his honesty; they are judgments the writers backed with their own money. And that trust was not misplaced: Mr. Wang's spoofing took place only in his own and his wife's personal brokerage accounts; it had nothing to do with Greenroots and never touched investor funds. That these investors submitted letters on Mr. Wang's behalf, knowing of his crime, shows that they still believe in his fundamental integrity.

Mr. Wang's childhood is relevant chiefly for what it explains about his present diagnoses. [redacted]

[redacted]

**2. Family**

Mr. Wang has been married to Lijuan Chen, a real estate agent, since 1997. PSR ¶ 42. They have two sons: Tevin, 22, who lives in San Francisco, and [redacted] 11, who lives at home. PSR ¶ 47. [redacted]

**3.** [redacted]

[redacted]

[redacted]

[redacted]

### B. The Offense Conduct

#### 1. The "Mid-Price" Strategy

Mr. Wang's trading in American Depositary Receipts ("ADRs") began as a way to hedge positions in Hong Kong-listed stocks around earnings announcements. Craig Decl., Ex. A ("M. Wang Letter") at 1. At some point he noticed that one broker nearly always filled certain ADR orders at the "midpoint" between the published bid and ask, and only for a very small subset of ADRs. Beginning in October 2021, PSR ¶ 6, he exploited that quirk: he placed orders he did not intend to execute at prices above where he genuinely wanted to buy, or below where he genuinely wanted to sell, which narrowed the published spread and moved the midpoint; he then placed genuine orders in his other accounts to capture the difference; and he canceled the first set of orders once the genuine orders filled. PSR ¶¶ 8–11. Over three years, he did this more than 3,000 times, earning approximately $1,347,000. PSR ¶ 12.

Mr. Wang kept a running log of his thinking about his trading strategy—[redacted]

He titled it "Mid-price strategy." *See* Craig Decl., Ex. E at 1 (highlighting added). Those notes, which the government seized when executing a search warrant, show both that he knew the trading was deceptive and that he had rationalized it to himself as a quirk of a broker's execution practices, rather than a crime. Mr. Wang has described his flawed thinking to the Court in his own words: "I rationalized that my dishonest orders were not so harmful because I was just narrowing the pricing spread that had already existed, rather than moving the pricing spread up or down to a completely different pricing range. I acknowledge, of course, that my reasoning was self-serving and meant to justify my dishonest behavior." Craig Decl., Ex. A ("M. Wang Letter") at 2.

Mr. Wang's "mid-price strategy" was spoofing, and it is a federal crime. In evaluating his culpability, however, it is important to recognize what Mr. Wang did not do. Mr. Wang traded manually through retail brokerage interfaces. He used only his own and his wife's personal accounts. PSR ¶ 8. He acted alone; no employee, co-conspirator, algorithm, shell company, or straw account was involved. He did not involve Greenroots or touch any investor money, though he had access to it. He was never a licensed broker, market maker, or compliance professional. And finally, he holds no professional licenses, and his training was in physics and computer science, not securities regulation. PSR ¶ 53.

None of this excuses what Mr. Wang did. It does, however, distinguish his conduct from the institutional or algorithmic schemes that account for most criminal spoofing prosecutions. The government has recognized these same distinctions as mitigating in another spoofing prosecution, noting that the defendant there "was not within a U.S.-based financial institution with rigorous compliance and training functions," that his scheme "was not perpetrated by sophisticated securities professionals who trained in the United States and passed rigorous securities examinations," and that his conduct "did not involve flouting compliance protocols at his own firm." Gov't Sentencing Mem. at 12, 14, *United States v. Jiali Wang*, No. 22-cr-10123, ECF No. 114 (D. Mass. Nov. 23, 2022) ("*Jiali Wang* Gov't Mem."). And it matches the profile of the cases the government has resolved civilly, without criminal charges:

individual traders spoofing thinly traded securities through ordinary brokerage accounts, as in *Cerisano* and *Khachatryan*. *See* Part III.B., *infra*.

**2. Discovery and Voluntary Cessation**

Unlike most offenders, Mr. Wang did not stop his misconduct because he got caught or feared his misdeeds were about to be uncovered. He stopped because he realized he had been violating the law. In November 2024, he received a form anti-money-laundering letter from Fidelity, dated October 29, 2024, saying that temporary restrictions could be placed on his account if he did not respond. Craig Decl., Ex. D. When he called Fidelity, he was told it was a standard AML inquiry, that it had nothing to do with his trading, that there was nothing he needed to do, and that any restrictions on his account would be removed within a few days. His notes from that month record exactly that: "[F]idelity questions clear point to AML ONLY, no questions on trading . . . . (Fidelity said received the letter, nothing I should do, they will likely remove restriction within a few days??)" Craig Decl., Ex. E at 5 (highlighting added). The government agrees that the Fidelity letter was routine AML compliance, not an inquiry into Mr. Wang's trading activity. Craig Decl. ¶ 5.

But the letter nonetheless prompted Mr. Wang to research his strategy, and what he found caused him to immediately halt his conduct. Ex. A ("M. Wang Letter") at 2. He came across the term "spoofing," read about the prosecution of Navinder Sarao and an SEC action against a day trader, and he recognized similarities with his own behavior. His notes record the moment: "Stop it completely? Didn't know this is spoofing and not allowed until I saw this!!," followed by a link to a definition of spoofing Mr. Wang found on the internet. Craig Decl., Ex. E at 4 (highlighting added). The backup history of Mr. Wang's notes confirms that this entry was written after he received Fidelity's AML letter and months before any contact from law enforcement—not reconstructed after the fact: the entry is absent from an October 24, 2024 backup and present in a December 2, 2024 backup. Craig Decl., Exs. F & G. It is undisputed that Mr. Wang's spoofing ended by November 27, 2024. PSR ¶¶ 6, 12; Dkt. 1 ¶ 6.

Mr. Wang's notes accurately reflect his thinking at the time. He had no reason to believe anyone would ever read them, much less federal agents and prosecutors. Nor could he have

written them to deceive anyone: the same notes reveal, in detail, that he knowingly engaged in manipulative trading. They even record ideas for concealing his conduct from the market-makers his strategy depended upon. *See, e.g.,* Craig Decl., Ex. E at 1 ("Most important thing is to hide . . . [so] 1. Randomize the pattern. . . . 2. Reduce frequency. . . .3. Hold longer. . . ."). Importantly, these references to concealment are not about hiding from law enforcement. Mr. Wang admitted his conduct to federal agents the very first time he was asked about it, a fact the government acknowledges. Craig Decl. ¶ 7.

### 3. Immediate Admission and Full Accountability

Mr. Wang first learned that his trading was under investigation eight months later, in July 2025, when federal agents executed a search warrant at his home. PSR ¶ 12. He admitted his conduct to agents that day, before consulting a lawyer. PSR ¶ 16. The government does not dispute this: "[D]efendant undoubtedly admitted to his misconduct during [his] initial law enforcement interview." Craig Decl. ¶ 7.

Nothing changed once he retained counsel. He entered a pre-indictment plea agreement and pleaded guilty to a one-count Information on June 24, 2026. PSR ¶¶ 1–3; 16. He asked the Court's permission to pay his $1,347,000 forfeiture before sentencing; the Court granted the request on August 31, 2026, and he paid in full that day. PSR ¶ 13; Dkt. 24. In the SEC's parallel action, he consented to the entry of judgment before the complaint was filed, agreeing to disgorgement, a civil penalty, and a five-year prohibition on opening, maintaining, or trading in any brokerage account—in his name, a family member's, a company's, or anyone else's—unless he first provides the broker-dealer a copy of the SEC's complaint and judgment. PSR ¶ 17; *SEC v. Wang*, No. 26-cv-06291-HSG, Dkts. 2.1, 16. He closed Greenroots. PSR ¶ 55. Going forward, Mr. Wang intends to focus on long-term, buy-and-hold investing. PSR ¶ 45.

The Probation Office notes that "Mr. Wang has since taken responsibility for his actions, and it appears his remorse is genuine." PSR, Sentencing Recommendation at 2. In his letter to the Court, Mr. Wang attributes his offense to "arrogance and financial motivation on my part," and acknowledges, "I caused economic harm to innocent counterparties, damaged my

reputation, brought shame and hardship to my family, and, just as important, harmed the integrity of the market." Ex. A ("M. Wang Letter") at 2.

### C. The Guidelines and the Parties' Positions

The parties and the Probation Office agree on the Guidelines calculation: a base offense level of 6, a 14-level increase because Mr. Wang's gain of $1,347,000 is used as a proxy for a loss that cannot reasonably be calculated, a 2-level reduction as a zero-point offender, and a 3-level reduction for acceptance of responsibility, for a total offense level of 15. PSR ¶¶ 19–28. With a criminal history category of I, the advisory range is 18 to 24 months. PSR ¶ 60. Under the plea agreement, the government will recommend a sentence at the low end of that range. PSR ¶ 3. The Probation Office recommends a downward variance to 15 months, citing Mr. Wang's lack of criminal history and family obligations. PSR Sentencing Recommendation at 1–2. Mr. Wang asks the Court to vary further downward, to a sentence without imprisonment, in keeping with the sanctions most typically imposed for spoofing.

## III. SENTENCING ARGUMENT

### A. The Legal Standard

The Court's "overarching statutory charge" is to impose a sentence "sufficient, but not greater than necessary" to serve the purposes of sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). The advisory range is "the starting point and the initial benchmark," not a presumption. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). Probation is statutorily available for this Class D felony, PSR ¶ 63, but because Mr. Wang's range falls in Zone D, PSR ¶¶ 60, 64, the sentence he requests requires a variance. A variance to probation does not require "extraordinary circumstances," and the Supreme Court and the Ninth Circuit have affirmed such sentences against ranges well above this one. *Gall*, 552 U.S. at 47, 59–60 (probation; 30–37 months); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam) (probation; 41–51 months); *United States v. Edwards*, 595 F.3d 1004, 1018 (9th Cir. 2010) (probation with community service; 27–33 months); *United States v. Autery*, 555 F.3d 864, 873 (9th Cir. 2009). Nor is probation (particularly with a period of home confinement) leniency; it is "a substantial restriction of freedom." *Gall*, 552 U.S. at 44, 48.

The advisory range deserves limited weight here for a further reason: it is almost entirely a product of the gain table. Mr. Wang's base offense level is 6. PSR ¶ 19. Without the 14-level increase for his $1,347,000 gain, his zero-point and acceptance reductions would yield an offense level of 2. The recommendation of imprisonment thus rests on a single dollar figure, one the Guidelines use only as a stand-in because loss cannot reasonably be calculated. PSR ¶¶ 19–28. Courts have repeatedly observed that the loss table is not grounded in empirical study of past sentencing practice, and that its successive increases, directed by Congress, have multiplied recommended sentences for financial offenses without empirical support. *United States v. Corsey*, 723 F.3d 366, 379–80 (2d Cir. 2013) (Underhill, J., concurring); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). A sentencing court may vary from a guideline that does not "exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *see United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011).

The nature of the harm points the same way. Before the Commission eliminated departures in 2025, the fraud guideline itself recognized that a securities offense producing an aggregate harm that is "substantial but diffuse" may yield an offense level that "substantially overstates the seriousness of the offense." USSG §2B1.1 cmt. n.21(C) (2024). The government has described the harm caused by equity spoofing in just those terms: "real (even if diffuse)." *Jiali Wang* Gov't Mem. at 12. As with the former zero-point departure discussed below, the facts that once supported a departure remain a proper basis for a variance. *See* USSG App. B, Pt. III (2025).

### B. A Custodial Sentence Would Create, Not Avoid, an Unwarranted Disparity

Section 3553(a)(6) directs the Court to avoid unwarranted disparities among similarly situated defendants. Measured against the individuals whose conduct most resembles Mr. Wang's and whom regulators have pursued for spoofing—most of whom were never criminally charged at all—a prison term for Mr. Wang would be the disparity. The government itself has acknowledged that "there are numerous instances in recent years in which cases involving

similar market manipulation conduct ha[ve] been charged only by the SEC and not criminally," and that the cases resolved criminally, most of which involve more egregious conduct, "have . . . often included sentences significantly below the guidelines sentencing ra[n]ge." *Jiali Wang* Gov't Mem. at 14.

We have identified 22 individuals sentenced for spoofing-related offenses over the last ten years, all of whom are listed in the table below. Most of these were not individual traders like Mr. Wang: sixteen traded futures or Treasury securities for banks or trading firms, and three took part in organized, multi-trader equity spoofing rings. Even so, seven of those charged were not incarcerated at all,[1] and three more—Navinder Sarao, Jiongsheng Zhao, and Jiali Wang—were sentenced to time served after spending between three and about ten months in custody before sentencing.[2] The remaining twelve were sentenced to prison. But every one of those twelve for whom offense-level information is available (ten of the twelve) had a final offense level higher than Mr. Wang's level 15, and all but one had an offense level of 22 or higher; the exception, Christopher Jordan, was at level 17 but had a higher criminal history category than Mr. Wang. Likewise, all but one of the defendants who received noncustodial sentences had offense levels well above Mr. Wang's 15—ranging from levels 20 to 28 (based on the available information). Tyler Forbes, for example, a bank Treasuries trader at level 20 facing an incarceration range of 33 to 41 months, received time served with a year of home confinement and 1,000 hours of community service. Several of the noncustodial sentences—including those of Christiaan Trunz (level 27) and John Edmonds (level 28)—reflected cooperation with the government. The only defendant with an offense level below Mr. Wang's was David Liew, at level 13, a junior Deutsche Bank trader who cooperated in the prosecution of his superiors over approximately five years and received a sentence of one day, time served.

---

[1] David Liew, whose "extraordinary cooperation" the government recognized in recommending a probationary sentence, received a sentence of one day, time served. *See United States v. Liew*, 17-cr-1, ECF No. 93 at 1; ECF No. 95 (N.D. Ill. 2021).

[2] Sarao served about four months in a UK prison, Zhao about ten months pending extradition, and Jiali Wang about three and a half months (102 days) in pretrial detention. *United States v. Sarao*, No. 15-cr-75, ECF No. 121 at 12, 37 (N.D. Ill.); *United States v. Zhao*, No. 18-cr-24, ECF No. 74 at 33; Def.'s Sentencing Mem. at 1 (N.D. Ill.), *United States v. Jiali Wang*, No. 22-cr-10123, ECF No. 113 at 1 (D. Mass. Nov. 23, 2022); *Jiali Wang* Gov't Mem. at 1.

| Universe of Criminal Spoofing Sentences Located by Defense Counsel | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Case** | **District** | **Offenses** | **CHC** | **FOL** | **Guidelines Range** | **Sentence** |
| 2016 | *United States v. Michael Coscia*, 14-cr-551 | N.D. Ill. | 18 U.S.C. § 1348<br><br>7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | *[3] | 27 | 70-87 months | 36 months imprisonment<br><br>24 months supervised release |
| 2020 | *United States v. Navinder Singh Sarao*, 15-cr-75 | N.D. Ill. | 18 U.S.C. § 1343<br><br>7 U.S.C. § 13(a) | I | 28 | 78-97 months | Time served (4 months pending extradition)<br><br>12 months supervised release (home confinement) |
| 2020 | *United States v. Jiongsheng "Jim" Zhao*, 18-cr-24 | N.D. Ill. | 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | I | 19 | 30-37 months | Time served (ten months pending extradition) |
| 2020 | *United States v. Aleksandr Milrud*, 15-cr-455 | D.N.J. | 18 U.S.C. § 371 | * | 23 | * | 60 months probation |
| 2021 | *United States v. Cedric Chanu*, 18-cr-35 | N.D. Ill. | 18 U.S.C. §§ 1343, 2 | I | 25 | 57-71 months | 12 months and 1 day imprisonment |
| 2021 | *United States v. Kamaldeep Gandhi*, 18-cr-609 | S.D. Tex. | 18 U.S.C. §§ 371, 1343, 1348; 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | * | * | * | 24 months imprisonment<br><br>36 months supervised release |
| 2021 | *United States v. David Liew*, 17-cr-1 | N.D. Ill. | 18 U.S.C. § 371 | I | 13 | 12-18 months | Time served |

[3] Asterisks denote information that counsel was unable to locate in court records, despite a diligent search.

| Universe of Criminal Spoofing Sentences Located by Defense Counsel | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Case** | **District** | **Offenses** | **CHC** | **FOL** | **Guidelines Range** | **Sentence** |
| 2021 | *United States v. Krishna Mohan*, 18-cr-610 | S.D. Tex. | 18 U.S.C. § 371 | * | * | * | 12 months probation |
| 2021 | *United States v. Joseph Taub*, 18-cr-79 | D.N.J. | 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2<br><br>18 U.S.C. § 371 | * | * | * | 18 months imprisonment<br><br>12 months supervised release |
| 2021 | *United States v. James Vorley*, 18-cr-35 | N.D. Ill. | 18 U.S.C. §§ 1343, 2 | I | 25 | 57-71 months | 12 months and 1 day imprisonment |
| 2022 | *United States v. Tyler Forbes*, 22-cr-97 | E.D.N.Y. | 15 U.S.C. §§ 78i(a)(2), 78ff | I | 20 | 33-41 months | Time served<br><br>24 months supervised release (12 months home confinement)<br><br>1,000 hours community service |
| 2022 | *United States v. Jiali Wang*, 22-cr-10123 | D. Mass. | 18 U.S.C. § 1349 | I | 28 | 78-97 months | Time served (102 days in pretrial detention)<br><br>9 months home detention |
| 2023 | *United States v. Edward Bases*, 18-cr-48 | N.D. Ill. | 18 U.S.C. § 1343<br><br>18 U.S.C. §§ 1349, 1343 | I | 25 | 57-71 months | 12 months and 1 day imprisonment<br><br>24 months supervised release |
| 2023 | *United States v. Corey Flaum*, 19-cr-338 | E.D.N.Y. | 7 U.S.C. § 13(a)(2) | I | 23 | 46-57 months | Time served |

| Universe of Criminal Spoofing Sentences Located by Defense Counsel | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Case** | **District** | **Offenses** | **CHC** | **FOL** | **Guidelines Range** | **Sentence** |
| 2023 | *United States v. Christopher Jordan*, 19-cr-669 | N.D. Ill. | 18 U.S.C. § 1343 | II | 17 | 27-33 months | 6 months imprisonment<br><br>18 months supervised release |
| 2023 | *United States v. Gregg Smith*, 19-cr-669 | N.D. Ill. | 7 U.S.C. § 13(a)(2)<br><br>18 U.S.C. § 1343<br><br>18 U.S.C. § 1348(1)<br><br>7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | I | 31 | 108-135 months | 24 months imprisonment<br><br>6 months supervised release |
| 2023 | *United States v. John Edmonds*, 18-cr-239 | D. Conn. | 18 U.S.C. §§ 371, 1343, 1348(1); 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2)<br><br>18 U.S.C. § 1348(1) | I | 28 | 78-97 months | Time served<br><br>12 months supervised release<br><br>100 hours community service |
| 2023 | *United States v. Michael Nowak*, 19-cr-669 | N.D. Ill. | 7 U.S.C. § 13(a)(2)<br><br>18 U.S.C. § 1343<br><br>18 U.S.C. § 1348(1)<br><br>7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | I | 27 | 70-87 months | 12 months and 1 day imprisonment<br><br>6 months supervised release |
| 2023 | *United States v. John Pacilio*, 18-cr-48 | N.D. Ill. | 18 U.S.C. §§ 1349, 1343<br><br>18 U.S.C. § 1343<br><br>18 U.S.C. § 1348(1) | I | 25 | 57-71 months | 12 months and 1 day imprisonment<br><br>24 months supervised release |

| Universe of Criminal Spoofing Sentences Located by Defense Counsel | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Case** | **District** | **Offenses** | **CHC** | **FOL** | **Guidelines Range** | **Sentence** |
| 2023 | *United States v. Christiaan Trunz*, 19-cr-375 | E.D.N.Y. | 18 U.S.C. § 371<br><br>7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2) | I | 27 | 70-87 months | Time served |
| 2024 | *United States v. Michael Kane*, 23-cr-20172 | S.D. Fla. | 18 U.S.C. § 371<br><br>18 U.S.C. § 1349<br><br>18 U.S.C. §§ 1343, 2(a) | I | 30 | 97-121 months | 45 months imprisonment |
| 2024 | *United States v. Xiaosong Wang*, 24-cr-10239 | D. Mass. | 18 U.S.C. § 1349 | I | 22 | * | 30 days<br><br>Removal from United States |

The prison sentences reflected in the table also rest on aggravating facts that are absent here. Michael Coscia commissioned computer programs designed to do nothing but spoof, and the court applied enhancements for sophisticated means, use of a special skill, and obstruction of justice after concluding that he had not testified truthfully at trial. *United States v. Coscia*, 866 F.3d 782, 789 (7th Cir. 2017); Sentencing Tr. 19–22, *United States v. Coscia*, No. 14-cr-551, ECF No. 162 (N.D. Ill. July 15, 2016). Edward Bases and John Pacilio were found to have taught and encouraged others to carry out their spoofing, and Bases bragged openly to colleagues about manipulating the market. Sentencing Tr. 31–32, 63, *United States v. Bases*, No. 18-cr-48, ECF No. 740 (N.D. Ill. Mar. 17, 2023); Sentencing Tr. 57, *id.*, ECF No. 741. The court imposed Chanu's sentence in part to send the message that Chanu's reply, "teach me how to do that," was not the proper response to a reference to market manipulation. Sentencing Tr. 36–37, 40, *United States v. Vorley*, No. 18-cr-35, ECF No. 403 (N.D. Ill. June 30, 2021). Mr. Wang traded manually and alone, taught and recruited no one, and stopped on his own.

Even defendants whose conduct carried aggravating features like these have received probation. Aleksandr Milrud pleaded guilty to conspiracy to commit securities fraud for orchestrating an equity spoofing scheme in which he recruited and managed other traders as far

away as Korea and spread the manipulative trading across multiple accounts to conceal it. Information ¶ 2, *United States v. Milrud*, No. 15-cr-455, ECF No. 21 (D.N.J. Sept. 10, 2015). He conceded a gain of between $1 million and $2.5 million—a range that encompasses Mr. Wang's gain—as well as enhancements for sophisticated means and for his role as a manager or supervisor. Plea Agreement at 8, *id.*, ECF No. 25. He was sentenced to five years of probation and a $10,000 fine. Judgment at 2, 5, *id.*, ECF No. 45 (D.N.J. Apr. 24, 2020).

Jiali Wang's case is equally instructive, as is the government's position in it. By the government's own account, Jiali Wang led a six-year scheme carried out by at least eight co-conspirators whom he hired and who operated, almost exclusively, from China; used more than 140 brokerage accounts, including accounts in the names of his spouse, his father-in-law, and other nominees; sent brokers false explanations when they questioned the trading; opened new accounts when brokers closed old ones; and generated approximately $8.19 million in illicit profits. *Jiali Wang* Gov't Mem. at 2, 4–5, 7. His offense level was 28, with an advisory range of 78 to 97 months. *Id.* at 6. The government nonetheless recommended a sentence of time served—roughly three and a half months, all of it pretrial detention—followed by nine months of supervised release on home detention, and the court sentenced him to time served. *Id.* at 1, 6; Judgment, *United States v. Jiali Wang*, No. 22-cr-10123, ECF No. 125 (D. Mass. Dec. 8, 2022). The government, in other words, sought no imprisonment beyond pretrial custody for the leader of an international, multi-person, multi-million-dollar scheme that involved deceiving brokers. Here, Mr. Wang acted alone, in his own and his wife's accounts, with no co-conspirators or straw accounts; gained about one-sixth as much; and stopped on his own before anyone contacted him.

The broader enforcement landscape points the same direction. For more than a decade, the government has resolved individual equity spoofing cases on facts materially indistinguishable from this one through SEC disgorgement, civil penalties, injunctions, and trading bars, without any criminal charges. That includes cases with far more egregious facts, such as where the trader continued after explicit broker warnings (*Xie, Khachatryan, Cerisano, O'Brien*), used accounts in other people's names (*Khachatryan, Castro Leon*, *Patel*), concealed

the conduct when questioned (*Cole, O'Brien*), or made far more money (*Lek, Chen, O'Brien, Patel*).

Most recently, in August 2026, the SEC settled *SEC v. Cerisano*, in which the trader spoofed for roughly four years in at least 3,000 instances, earned more than $1.1 million, and kept going after a broker-dealer closed his account. He consented to disgorgement, a civil penalty, and the same type of five-year trading restriction Mr. Wang faces. He was not charged with a crime. Similarly, in *SEC v. O'Brien*, an individual trader used accounts in his own and his wife's names at fourteen brokerage firms to carry out more than 18,000 coordinated trading events, disregarded warnings from several brokers, opened new accounts when his were closed, and kept going after the SEC subpoenaed him. The SEC obtained a civil judgment of more than $15 million in disgorgement and penalties, which was affirmed on appeal; he was not criminally charged. *SEC v. O'Brien*, 674 F. Supp. 3d 85, 105 (S.D.N.Y. 2023), *aff'd*, 2024 WL 2813722 (2d Cir. June 3, 2024) (Summary Order). And in April 2026, the SEC filed a civil action against a day trader alleged to have placed and then quickly canceled non-bona fide limit orders on more than a thousand occasions, in hundreds of stocks, from May 2021 to January 2024, generating more than $5 million in ill-gotten gains—and to have opened accounts in another person's name to continue after brokers restricted and closed his own. The SEC seeks injunctions, disgorgement, and a civil penalty. *SEC v. Harsh V. Patel*, No. 1:26-cv-03203 (S.D.N.Y. filed Apr. 20, 2026); SEC Lit. Rel. No. 26532 (Apr. 20, 2026). Mr. Patel has not been charged criminally.

**Selected SEC Civil Spoofing Enforcement Actions**
**Resolved Without Criminal Charges Except as Noted (Year of Resolution Shown)**

| Year | Case Name[4] | Summary | Penalties |
|---|---|---|---|
| 2014 | *In re Visionary Trading LLC, et al.* (Five individuals and two entities), File No. 3-15823 | An owner of an unregistered day-trading firm used layering and spoofing for more than three years, generating approximately $984,000 in manipulation profits; the firm's other owners and its broker-dealer faced related registration and supervision charges. | Over $1.1 million in disgorgement, over $46,000 in prejudgment interest, $785,000 in penalties, and an industry bar. **No criminal charges.** |

[4] CM/ECF numbers are unavailable for matters resolved administratively, including those involving Visionary Trading LLC; Briargate Trading, LLC; Behruz Afshar; Xuepeng Xie; and Zachary Stevenson. Additional details and filings for such cases are available on the SEC's website, at https://www.sec.gov/enforcement-litigation/administrative-proceedings.

| Selected SEC Civil Spoofing Enforcement Actions Resolved Without Criminal Charges Except as Noted (Year of Resolution Shown) | | | |
|---|---|---|---|
| **Year** | **Case Name[4]** | **Summary** | **Penalties** |
| 2015 | *In re Briargate Trading, LLC and Eric Oscher*, File No. 3-16889 | Trading firm and cofounder engaged in a spoofing scheme targeting NYSE-listed securities for about one year, generating about $525,000 in profits. | $525,000 disgorgement, over $37,000 in prejudgment interest, $500,000 in civil penalties. **No criminal charges.** |
| 2016 | *In re Behruz Afshar, et al,* (Three individuals and two entities), File No. 3-16978 | Twin brothers and a friend, a former broker, used order mismarking and spoofing for more than one year to obtain execution priority, lower fees, and liquidity rebates. | Industry bars, over $1.89 million in disgorgement and penalties. **No criminal charges.** |
| 2019 | *SEC v. Lek Securities Corporation, et al.* (Three individuals and two entities), 17-cv-1789 (S.D.N.Y. filed March 10, 2017) | Avalon principal Fayyer and control person Pustelnik spoofed for nearly six years and conducted a three-year cross-market manipulation scheme, generating more than $25 million combined. Lek Securities and CEO Sam Lek facilitated Avalon's layering and spoofing by providing U.S. market access, reducing layering controls, and permitting improper trades. | After a jury verdict, Avalon, Fayyer, and Pustelnik were each ordered to pay $7.5 million in penalties. Lek Securities and Lek settled before trial for $1.42 million combined in penalties and over $525,000 in disgorgement and prejudgment interest. **No criminal charges.** |
| 2021 | *In re Xuepeng Xie*, File No. 3-20599 | Xie used multiple brokerage accounts in a spoofing and layering scheme that generated over $1.8 million in illicit profits, and continued the scheme despite explicit spoofing warnings from several broker-dealers. | Over $1.8 million in disgorgement, over $243,000 in prejudgment interest, a $600,000 civil penalty, and a five-year trading bar. **No criminal charges**. |
| 2022 | *SEC v. Shuang Chen, et al.* (17 individuals and 1 entity, plus various relief defendants), 19-cv-12127 (D. Mass. filed Oct. 15, 2019) | Defendants used dozens of accounts at different brokerage firms to inflate securities prices, then used deceptive conduct to evade detection. The scheme involved more than 3,000 securities, lasted multiple years, and generated over $35 million in illicit proceeds. | Sixteen defaulting defendants were ordered to pay over $73.5 million; ten relief defendants, over $1.5 million. Only 2 of the 17 individual defendants were criminally charged (Jiali Wang and Xiaosong Wang); the remaining **15 individual defendants faced no criminal charges**. |
| 2023 | *SEC v. James David O'Brien*, 21-cv-09575 (S.D.N.Y. filed Nov. 18, 2021) | Individual trader used his and his wife's accounts at fourteen brokerage firms to conduct over 18,000 coordinated trades, was warned repeatedly, opened new | Over $15 million in disgorgement and penalties, affirmed on appeal. **No criminal charges.** |

| Selected SEC Civil Spoofing Enforcement Actions Resolved Without Criminal Charges Except as Noted (Year of Resolution Shown) | | | |
|---|---|---|---|
| **Year** | **Case Name**[4] | **Summary** | **Penalties** |
| | | accounts when his were closed, and persisted after being subpoenaed. | |
| 2024 | *SEC v. Joel David Castro Leon and Shmuel A. Sherr*, 24-cv-09214 (D.N.J. filed Sept. 17, 2024) | Sherr let Leon place fraudulent orders through brokerage accounts in Sherr's name. They generated over $415,000 in illicit profits, split 90-10. | Over $400,000 in disgorgement, $139,000 in civil penalties, and trading bars. **No criminal charges.** |
| 2024 | *In re Zachary Stevenson*, File No. 3-22356 | Stevenson spoofed thinly traded securities across multiple brokerage accounts for nearly two years, generating over $381,000. | Over $438,000 in disgorgement and prejudgment interest, a $150,000 civil penalty, and a four-year trading bar. **No criminal charges**. |
| 2025 | *SEC v. Ryan N. Cole*, 25-cv-01038 (E.D. Cal. filed Aug. 11, 2025) | Cole, a financial-firm trader, spoofed thinly traded options, placing spoof orders across neighboring options series, and concealed the scheme by giving misleading answers about his trading when questioned. The scheme generated approximately $234,000 in illicit profits. | Over $286,000 in disgorgement and prejudgment interest, over $70,000 in civil penalties, and a five-year trading bar. **No criminal charges**. |
| 2025 | *SEC v. Artur Khachatryan*, 25-cv-11863 (C.D. Cal. filed Dec. 16, 2025) | Khachatryan spoofed thinly traded securities outside regular market hours for approximately two years, generating over $373,000 in illicit profits. After multiple broker-dealers restricted or closed his accounts, he continued trading through accounts opened in other people's names. | Over $396,000 in disgorgement and prejudgment interest, a $112,165 civil penalty, and a four-year trading bar. **No criminal charges**. |
| 2026 | *SEC v. Frank M. Cerisano, Jr.*, 26-cv-02444 (D. of Nevada) | Cerisano spoofed for approximately four years, in a scheme involving at least 3,000 spoofing instances. After a broker-dealer warned him about suspicious conduct and closed his account, he continued through accounts at other broker-dealers, generating over $1.1 million. | Over $1.14 million in disgorgement and prejudgment interest, a civil penalty of over $334,000, and a five-year trading bar. **No criminal charges**. |

The treatment of these civil respondents bears directly on proportionality. Mr. Wang already faces every sanction the SEC imposed in those cases. He also has a felony conviction, has forfeited his full gain to the United States, and stands before this Court for sentencing. He has, in other words, already been punished more severely than most of the individuals whom the government has pursued for this conduct. Adding imprisonment would place Mr. Wang's case well outside the heartland of government spoofing enforcement—notwithstanding that,

unlike most of those respondents and defendants, he stopped on his own and confessed on first contact.

Finally, the Probation Office's JSIN data, PSR ¶ 76, are not the right benchmark for this case. They capture every defendant sentenced under §2B1.1 with a final offense level of 15 and a criminal history category of I—a cohort that sweeps in the full range of fraud, theft, and embezzlement offenses, many with identifiable victims suffering measurable losses, and that says nothing about how the government treats spoofing in particular. Here, by contrast, the Guidelines use Mr. Wang's gain as a proxy precisely because loss cannot reasonably be calculated. PSR ¶¶ 19–28. But even on that benchmark, the sentences the government and the Probation Office propose would be well above the norm. Of the 521 defendants sentenced in the last five years with Mr. Wang's offense level and criminal history category, nearly a third—160—received no imprisonment at all, and the average sentence across the group was 10 months. PSR ¶ 76. Notably, the data for those 521 defendants exclude all defendants who received substantial assistance credit. *Id.* Even among the 361 defendants who were imprisoned, the median term was 12 months and the average 13 months—below the 18-month low end of the advisory range and below the 15 months the Probation Office recommends here. *Id.*

### C. Voluntary Cessation and Immediate Candor Eliminate Any Need for Specific Deterrence

The Court need not take Mr. Wang's word that he will never do this again. The record supplies objective proof. Mr. Wang quit spoofing in November 2024, while it was still profitable and undetected, within days of learning it was illegal, without any warning from any broker, regulator, or agent, and eight months before federal agents appeared at his door. Dkt. 1 ¶ 6. He has not traded that way since. PSR ¶ 12.

*Gall* is squarely on point. There, the defendant withdrew from a drug conspiracy on his own, years before he was charged. Against a range of 30 to 37 months in prison, the district court imposed a 36-month term of probation—with no home detention or other confinement, 552 U.S. at 43–44, 48—and the Supreme Court affirmed, holding that the district court "quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken

not at the direction of, or under supervision by, any court, but on his own initiative," and that this "lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts." 552 U.S. at 59.

His conduct after the agents arrived confirms the point. He confessed without first trying to protect himself through counsel. He pleaded guilty before indictment. He paid his forfeiture well before sentencing, the day the Court allowed it. He consented to the SEC's judgment before a complaint was filed. PSR ¶¶ 13, 16–17. Post-offense conduct of this kind is "highly relevant" to several § 3553(a) factors because it "provides the most up-to-date picture" of the defendant's history and characteristics and sheds light "on the likelihood that he will engage in future criminal conduct." *Pepper v. United States*, 562 U.S. 476, 491–92 (2011).

Mr. Wang is also a zero-point offender under U.S.S.G. §4C1.1, PSR ¶¶ 25, 32, an adjustment the Commission adopted on empirical findings that such offenders reoffend at markedly lower rates. U.S.S.G. App. C, Amend. 821 (2023). The same amendment added commentary providing that a non-custodial sentence is "generally appropriate" for zero-point offenders whose ranges fall in Zones A or B, USSG §5C1.1 cmt. n.9 (2025), and—without regard to zone—that "a departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate" for a zero-point offender whose range "overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." U.S.S.G. App. C, Amend. 821 (2023) (former §5C1.1 cmt. n.10(B)). The Commission removed departure provisions from the Manual in 2025, but it explained that "[t]he removal of departures does not limit the information courts may consider in imposing a sentence," and that judges who would have relied on a former departure ground may continue to rely on the same facts in deciding whether to vary. U.S.S.G. App. B, Pt. III (2025); *see* U.S.S.G. App. C, Amend. 836 (2025). This judgment—that a zero-point offender whose offense is neither violent nor otherwise serious may warrant a non-custodial sentence even in Zone D—remains a proper consideration here. A person who stops a profitable crime

because he learns it is wrong, and who admits his illegal conduct the first time he is asked, does not need prison to teach him either lesson.

Crediting that conduct also serves general deterrence. A sentence that gives real weight to voluntary withdrawal and immediate candor tells others in Mr. Wang's position that stopping and coming clean matters—exactly the incentive the system should want to create.

Nor does general deterrence require prison here. The research is consistent that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment." Nat'l Inst. of Justice, *Five Things About Deterrence* (May 2016), NCJ 247350[5] (emphasis in original). The concern that some spoofers go undetected is answered by detection, not by a longer sentence for the person who was caught. Detection also reaches back: this prosecution shows that a trader who stops can still face a federal felony, forfeiture, and SEC sanctions long after the conduct ends. And the deterrent message here has already been delivered, in public: a federal felony conviction; forfeiture of every dollar Mr. Wang made; an SEC injunction, disgorgement, and civil penalty; and five years in which he cannot open or keep a brokerage account without first handing the broker the SEC's complaint and judgment (which will likely operate as a complete bar, because few brokerages will open an account for someone under SEC sanctions). The Probation Office acknowledges that Mr. Wang's "felony conviction, additional civil penalties, forfeiture, and investment restrictions" have a deterrent effect. Sentencing Recommendation at 2.

Because the government itself frequently resolves equity spoofing cases akin to Mr. Wang's without any criminal charges, *see supra* Part III.B, the marginal deterrent signal of imprisoning one individual equity trader who stopped on his own is slight. The government has made a similar point elsewhere, adopting the observation that spoofing "is not a violent crime, and therefore is not among the most serious of crimes," and acknowledging that a longer sentence was not needed for deterrence where the conduct did not involve trained securities professionals flouting compliance protocols. *Jiali Wang* Gov't Mem. at 11, 14. And on facts like these, "a sentence of imprisonment may work to promote not respect, but derision, of the

[5] *Located at* https://www.ojp.gov/pdffiles1/nij/247350.pdf?st_source=.

law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quoting district court).

**D. Incarceration Would Devastate a Family [redacted]**

The Probation Office identified Mr. Wang's "familial obligations" as a basis for a sentence below the range. PSR, Sentencing Recommendation at 2. The facts underlying that finding are set out above and are not in dispute: [redacted]

Family responsibilities, particularly to minor children, are a recognized basis for a below-Guidelines sentence, and after *Gall* no showing of "extraordinary" circumstances is required. 552 U.S. at 47; *United States v. Menyweather*, 431 F.3d 692, 700 (9th Cir. 2005) (affirming substantial downward adjustment based in significant part on defendant's role as caregiver to minor child). [redacted] Home detention would permit Mr. Wang to continue that role while imposing a substantial restriction on his liberty. *Gall*, 552 U.S. at 48. [redacted]

**E. Mr. Wang Has Already Been Punished Substantially, and the Remaining Purposes of Sentencing Do Not Require Prison**

Finally, the Court should weigh what has already happened to Mr. Wang. He has given up $1,347,000—every dollar he earned from the scheme. PSR ¶ 13. He faces disgorgement and a civil penalty on top of that. For the next five years he cannot open or keep a brokerage

account without first handing the broker the SEC's complaint and judgment. PSR ¶ 17. As a practical matter, that restriction forecloses any opportunity to repeat the offense. He has closed Greenroots, PSR ¶ 55, and under the pending SEC judgment (also before this Court), he may not manage other people's money as an investment adviser unless and until the Commission approves his reentry. Craig Decl., ¶ 12. He is a felon. Courts properly consider consequences of this kind in deciding how much additional punishment is needed. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *United States v. Pauley*, 511 F.3d 468, 474–75 (4th Cir. 2007); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016).

The Probation Office reasons that a custodial term is needed to "send[] the message" that spoofing "will not be tolerated." PSR Sentencing Recommendation at 2. But, as shown in Part III.C, that message has already been sent. And the Commission's own data show that zero-point offenders like Mr. Wang reoffend at markedly lower rates. USSG App. C, Amend. 821. [redacted]

A noncustodial sentence of the kind requested is a substantial punishment. Probation with home detention confines Mr. Wang to his home for a year or more; 500 hours of community service puts him to work for the public; [redacted], PSR ¶¶ 49–50; and the trading restrictions imposed by the SEC further guard against any repetition of this offense. Mr. Wang does not object to the $10,000 fine the Probation Office recommends, PSR ¶ 67 & Sentencing Recommendation at 1, and will pay it promptly; together with community service, it satisfies the statutory requirement that probation include a fine, restitution, or community service. 18 U.S.C. § 3563(a)(2); PSR ¶ 63. Any violation would return him to this Court facing revocation and imprisonment. 18 U.S.C. § 3565(a)(2). This sentence is sufficient to serve every purpose in § 3553(a)(2).

A sentencing package of this magnitude ensures accountability while allowing Mr. Wang to meaningfully repay his debt to society. Drawing on his background as a software engineer and data scientist, PSR ¶ 55, Mr. Wang proposes to perform 500 hours of community service teaching free classes on the practical and safe use of AI and other digital tools through

libraries, schools, senior centers, and nonprofit organizations, with a focus on underserved communities where access to that kind of instruction is scarce. He is also prepared to volunteer at food banks or in any other role the Probation Office approves. Craig Decl., Ex. I. He seeks this work to make amends and to help close a technology gap that he believes will only widen as AI advances. *Id.*

## IV. OBJECTIONS TO THE PSR

Mr. Wang withdraws his objection to the PSR. There are no outstanding objections. PSR, Addendum.

## V. CONCLUSION

Mr. Wang committed a serious offense and has accepted responsibility for it at every stage. He ended the conduct on his own eight months before any law enforcement contact, admitted it on first contact, pleaded guilty before indictment, and forfeited his entire gain before sentencing. PSR ¶¶ 12–13, 16. He has already been sanctioned more heavily than most of the individuals the government has pursued for the same conduct, and a term of imprisonment would be imposed [redacted] PSR ¶¶ 43–44, 50. For these reasons, Mr. Wang respectfully asks the Court to impose a sentence of probation with a substantial term of home detention, 500 hours of community service, continued mental health treatment, and such trading restrictions as the Court deems appropriate.

Dated: October 8, 2026

Respectfully submitted,

/s/ Amy Craig

AMY CRAIG
MILES EHRLICH
EHRLICH & CRAIG LLP

Counsel for Mingran Wang