# Exhibit A -

# Defendant Mingran Wang's Letter to the Court

Honorable Judge Gilliam,

Over the past year, since learning that my conduct had led to a criminal investigation, I have gone through periods of shock, regret, depression, and shame. I have asked myself countless times why I did it and how I lost my way. Only after many months of painful self-examination have I felt able to speak about these failures more clearly and to provide some context on what I have come to understand.

First, some background on who I am.  I was born in China in 1974. After graduating from college, I came to the United States from China in 1997. I originally studied physics and later earned a master's degree in computer science from the University of Iowa. After that, I worked for several technology companies, including Yahoo, Electronic Arts, and Apple, as a software engineer and data scientist. Over time, I developed a deep interest in investing. I was self-taught in both investing and trading, but my real interest was always in fundamental long-term investing rather than short-term trading.

In 2014, I left my job as a data scientist to focus on long-term investing. I did not begin with much capital, and because I still had to make a living, I felt enormous pressure to perform early on. At the same time, long-term investing requires patience and the ability to avoid becoming overly focused on short-term results. I had very few people around me with any investing background, since most of my friends were in technology. Nearly all of my learning in this area was solitary. I went to the library almost every day, reading books on value investing and teaching myself. Through hard work, and also some very good luck, my investment results eventually became quite good.

While investing in Hong Kong stocks, I began to start trading in securities derived from foreign companies, called American Depositary Receipts or "ADRs."  I would sometimes buy and sell ADRs in the United States to hedge my Hong Kong positions after earnings announcements. In trading those ADRs, I discovered that one particular broker almost always filled trade orders for a small subset of ADR securities at the "midpoint" price, meaning the price halfway between the publicly quoted buying and selling prices, which together are known as "the spread."

I realized that I could place temporary orders at prices higher than I genuinely intended to buy, or lower than I genuinely intended to sell, and these bids would have the effect of narrowing the published spread and temporarily nudging the midpoint up or down. Because this broker executed all trades for these ADRs at the midpoint of the spread, moving one side of the spread "in closer" before trading allowed me to make money. In my prior experience, it is extremely rare for brokers to execute transactions at midpoint

pricing, especially in thinly-traded securities, where the spread (or gap) between buying and selling prices is wide.

Surprised at my discovery, I allowed myself to believe that I had uncovered a rare market anomaly, or pricing inefficiency, that I could use to generate profit. I told myself that I was just generating special gains from this odd quirk in the way the broker executed the trades. I rationalized that my dishonest orders were not so harmful because I was just narrowing the pricing spread that had already existed, rather than moving the pricing spread up or down to a completely different pricing range.

I acknowledge, of course, that my reasoning was self-serving and meant to justify my dishonest behavior. And unfortunately, I relied on this flawed thinking to overlook how my conduct—placing fake orders to move prices (and execution midpoints) and then make money from more favorable trades—gave me an unfair advantage in the marketplace.

In November 2024, I learned from my research that what I had been doing was not just dishonest and harmful to other market participants, but that it was also a crime. I was shocked and ashamed when I realized this, and I stopped this trading practice immediately on my own.

From that moment up through today, I am still trying to confront myself and ask how I allowed myself to fall into this misconduct. It has been a painful process of self-examination and shame, often marked by sleepless nights. But it has also forced me to see my failures more honestly and clearly.

I had always considered myself to be an honest person who plays by the rules. But by telling myself that I was just "gaming" a rare market aberration that I had cleverly stumbled upon, I convinced myself that what I was doing "wasn't so bad." I understand that this self-serving belief reflected arrogance and financial motivation on my part. It is deeply painful to realize that I failed to live up to the fundamental moral standard that I believed I had always up upheld.

Although this case has been a profound source of shame for me, it has also served as a necessary wake-up call. It has forced me to confront my own arrogance, to become more honest with myself, and to understand more clearly the importance of humility, integrity, and self-discipline. By failing to live with honesty and humility, I caused economic harm to innocent counterparties, damaged my reputation, brought shame and hardship to my family, and, just as important, harmed the integrity of the market.

I deeply regret what I have done, and I am sincerely ashamed of it. After this is over, I hope to work even harder, in whatever lawful way remains available to me, to focus on

long-term, buy-and-hold fundamental investing and to spend time learning philosophy. I intend to focus on becoming a more honest, humble, and disciplined person.

Sincerely,

Wang

Mingran Wang